JUDGE TUCKER.
William Black, sometime about the year 1760, purchased of Allen M’Rae, a lot with some buildings thereon, in Alexandria ; the consideration paid by Black does not appear ; but that it was a purchase, for a valuable consideration, seems not to have been questioned. In February, 1762, Black intermarried with the complainant, Mrs. Claiborne : at this time he appears to have been in actual possession of the lot, which was in the occupation of Thomas Kirkpatrick who paid him rent for it, and in 1766 became the purchaser of it, from Black, who executed a conveyance for it to him on the Sth of May, 1773, in which he states (as I think) the purchase of the lot from M’Rae, and adds a covenant that himself was then seised of a good and indefeasible estate in fee-simple, therein. This deed was acknowledged by Black and recorded in the General Court ; and it was contended, at the bar, there was no evidence that Kirkpatrick ever received it, or agreed to it; but as he after-wards paid Black for the lot, (after some delay,) there appears to be no ground for this objection. Kirkpatrick dying, devised this lot to Henderson and others in *trust to divide it between his sisters ; Henderson in his answer denies that he accepted the trust: some of them sold the lot to Dennis Ramsay, who states in his answer that finding some defect in the title, he gave it up to the executors (the trustees) again. After this (I presume) Kennedy bought the lot at public sale, in September, 1795. Wilson bought it of him. The buildings have been greatly improved ; a part of the old being pulled down. Black died in January, 1802. In 1786, John M’Rae, as heir at law of Allen M’Rae, from whom Black purchased, but never had any conveyance, as far as appears, conveyed the lot to Fitzpatrick’s executors and trustees, (among whom Henderson is named.) Gibson, one of the trustees, in his answer says that he as surviving trustee and executor of Thomas Kirkpatrick, relinquished his powers and duties to William Wilson, by whom (it would seem) the lot was delivered up to public sale and bought by Kennedy.
1st. The first and principal question made in this cause is whether Mrs. Claiborne, the widow of Black, is, under all these circumstances, entitled to her dower in this lot, of which there is no proof that William Black, her husband, ever obtained any conveyance from Allen M’Rae of whom he purchased the same, although the fact that Black had peaceable possession thereof, and received the rents of Fitzpatrick by the hands of Allen M’Rae, (who in that respect appears to have acted as his agent) for many years, during his marriage, seems pretty clear.
The counsel for the defendants below, contend that Miam Black never had any legal estate in the lot, but merely an equitable one, of which his widow cannot be endowed. I shall inquire into the correctness of this position, as it respects the nature and quality of William Black’s estate. That William Black purchased the lot in question of Allen M’Rae, for a valuable consideration is not disputed; that he paid M’Rae for it is not disputed; that he entered into the possession of the lot with M’Rae’s consent is not disputed ; that he received the rents for several years, is, I think, proved ; that he was absolutely entitled to a conveyance in *fee-simple is not disputed : that he ever received any conveyance for it is denied, and is certainly doubtful; perhaps the presumption is against it. That his possession, perception of the rents, and sale of the lot to Kirkpatrick, all happened during the time he was married, is satisfactorily proved to my mind. That he executed, and Kirkpatrick accepted, the deed which was acknowledged in the General Court for the lot, I do not doubt. All these facts will deserve consideration, in an inquiry into the nature and quality of his estate in the lot during his marriage with the complainant.
By the common law, lands and tenements, might pass by alienation, either with or without deed, (c)
And such alienation without deed, or even writing, might be made by feoffment with livery of seisin ;(d) or by bargain and *686 sale ;(a) or by lease, for life, for years, or at will; or to one for life or years, with remainder over in fee-simple, fee-tail, or for life.(b) And such alienations by parol only, might also be made to uses ; as to A. to the use of B. in fee-simple, fee-tail, or otherwise, (c) And such uses-might either be express, as when declared either before, at, or after the time of making the estate ; (d) or implied in law, where no such declaration as before mentioned, was made: for where a man made a feoffment in fee without any consideration, the law construed the feoffment to be made to his own use, merely ; but if there were a valuable consideration paid, arid no use expressed, the law said it should be to the use of the bargainee, or feoffee, and his heirs, (e) And if a man by verbal agreement, in consideration of money, or the like, sold his land to another, or agreed and promised that the bargainee should have it for any time, a good use did arise at common law; and it was moreover held that a bargainee of land, for a valuable consideration, could not be seised of land to any other use but his own.(f) These alienations by parol though in great measure fallen into disuse were not invalidated in England until the statute of frauds and perjuries, 29 Car. II. c. 3, (which never was in force in Virginia,) was made ; which ^provides against conveying lands, or hereditaments for more than three years, or declaring any trust of them, otherwise than by writing ; and likewise invalidates all parol contracts for the sale of lands, (g) And if a man in consideration of so much money to be paid at a day to come, bargained and sold lands, the use passed presently; and after the day the party had an action for the money; for it is a sale, by the money paid either presently or afterwards, (h) Before the statute 1 R. III. c. 1, the feoffees to uses had not only all the estate in the land, but also all the power to give and dispose of it, insomuch, that cestui qui use, although the estate was created and expressly declared to be for his benefit, was nevertheless held to be a trespasser, if he entered upon the land, against the feotfee’s will. And though that statute enabled the cestui qui use to dispose of the lands, without his feoffee’s consent, and declared all acts done by him in respect to such disposition to be good, not only against himself and his heirs, but also against his feoffee in trust, yet it was held that all the power over the land still remained in the feoffee in trust, until the cestui qui trust had made such a disposition of it as the statute author-ised. A consequence was, that the feoffee in truth, many times contrary to the trust reposed in them, by secret conveyances, defrauded the cestui qui use, and prevented his disposing of the land as authorised by the statute ; and sometimes there was fraud in both ; for when cestui qui use by himself without the feoffees, by force of the statute and the feoffees by themselves without cestui qui use, by the common law had both, severally, absolute power to make a disposition of the same land, sometimes cestui qui use, by his secret estates, prevented the feoffees, and sometimes the feoffees, by the like secret estates, prevented the cestui qui use, so that they' played at double hand, and thereby beguiled the true intent of the statute, (i) To prevent this mischief, among others, the statute of uses, 27 Hén. VIII. c. 10, was made, whereby it was declared “that where any person or persons stand or be seised, or at any time thereafter shall happen to be seised of and in any lands, tenements, rents, services, reversions; remainders, *or other hereditaments, to the use, confidence, or trust of any other person or persons, or of any body politic by reason of any bargain, sale, feoffment, fine, recovery, covenant, contract, agreement, will, or otherwise by any means whatsoever : that in every such case, all and every such person and persons, and bodies politic, that have or hereafter shall have any such use, confidence, or trust, in fee-simple, fee-tail, or for term of life, or for years, or otherwise ; or any use, confidence, or trust in remainder, or reversion, shall from thenceforth stand and be seised, deemed and adjudged in lawful seisin, estate and possession of and in the same lands, &c. with their appurtenances, to all intents, constructions, and purposes in the law, of and in such like estates, as they had, or shall have in use, trust, or confidence of or in the same. And that the estate, title, right, and possession that were in such person ■ or persons that were or hereafter shall be seised of any lands, tenements, or hereditaments, to the use, confidence, or trust of any such person or persons, or of any body politic, be from henceforth clearly deemed and adjudged to be in him or them that have, or hereafter shall have such use, confidence or trust, after such quality, manner, form and condition, as they had before in or to the use, confidence, or trust, that was in them.” We are told, 1 Co. Rep. 132, that this statute (27 Hen. VIII. c. 10), was not made to extinguish or eradicate uses, but that it had advanced them by making the cestui qui use the absolute owner of the land instead of the feoffee in trust ; that before the statute, the office of the feoffee was to execute the estate according to the use, but that the statute hath taken away that office, and executes the possession to the use, and takes away all the trust and power out of the feoffees ; so that since the statute there is neither trust nor confidence reposed in the feoffees ; of whom it was said non possunt agere, aut permitiere aliquid, in prejudice of the cestui qui use. To this I will add that as far as I am able to discover, this statute availed not, either to extinguish, or invalidate conveyances at common law, any more *than uses; for to me it appears, that it matters not whether a use was created by deed or without deed, or by feoffment by parol,with livery of seisin, or by bargain, sale, contract, or agreement in writing , or by parol; or if such use were created or brought into existence in any other manner whatsoever, or by any means whatsoever, no matter what, the statute instantly trans *687 ferred the estate, right, title, and possession of the feoffee to uses, or of the person making any such bargain, sale, contracts, or agreement, to the persons for whose benefit, whether expressed, or implied in law, such feoffment, bargain, sale, contract, or agreement was made or intended by the parties, according to such intention, or to that of the law, in those cases where no consideration whatever was paid, or where a valuable consideration was paid by the purchasers, or vendee of the land, provided the feoffee to uses, at the time of making the feoffment, or the feoffee to uses at any time after ; or the bar-gainor, seller, or vendor of the land, at the time of the bargain, sale, contract, or agreement, or at any time after, during the continuance of the term or estate meant, intended, or agreed to be created, had in himself a seisin of the lands, intended to be conveyed, bargained, sold, or transferred. So that the cestui qui use, or purchaser for a valuable consideration, gained not a possession in law only, but a seisin in fee, not a title to enter into the land, but an actual legal estate. (a)
It is true that Lord Bacon, in his reading on this statute, seems to reject the words agreement, will, or otherwise, in the purview of the act, as having no operation ; or at least not such as I have supposed above. And his reason seems founded upon the use of the word will in the statute ; whereas, as he remarks, lands were not at that time, nor until seven years after, (32 H. VIII. c. 1,) de-visable. But great stress is laid in the preamble upon cases created by parol wills of lands, before that time ; and though lands were not generally devisable at that time, yet they were certainly devisable by custom, in many parts of England, (b) *And since the Legislature by the preamble of the statute, appear to have been informed of the evil of secret uses so created, and to have intended to remedy it, wherever it may occur, I see no reason for rejecting the word will, any more than any other operative word in the statute. A further reason why the word will, in the statute is not to be rejected as having no operation, arises from the purview of the 11th sect, of the statute, which declares “all true and just wills before made, or which should be made by any person, who should die before the first day of May, following, of lands, &c. shall be good and effectual in law after such fashion, manner and form, as they were commonly taken and used at any time within forty years before. ” Now this clearly proves that the Parliament did intend to provide for cases where uses might have been created by will: and that being the case, there is no reason for rejecting the words “agreement, or otherwise,” with which it is connected. See also Butler’s note on Co. Lit. p. 277, a. & b. I should certainly distrust my own judgment in differing from so great an authority, had I not Lord Coke on my side, who says expressly, that in some Cities and Boroughs, lands may pass as chattels, by will nuncupative, or parol, without writing : to which his commentator, Mr. Hargrave, subjoins the following note, “But now by the 29th of Car. II. c. 3, a will of lands de-visable by custom is not good, unless it be in writing, signed and attested in the same manner as a will of lands devisable by statute.” Co. Lit. Ill, lb. a. 3. The same commentator adds, “through the medium of uses, the power of devising was continually exercised with effect and reality. But at length this practice was checked, not accidentally, but designedly, by the 27 H. VIII. which, by transferring the possession, or legal estate, to the use, necessarily and compulsively consolidated them into one, and so had the effect of wholly destroying all distinctions between them, till means to evade the statute were invented.” Ib. Ill, b. n. 1. The same learned commentator likewise says elsewhere. ^“Before the statute of uses, equitable estates of freehold, might be created through the medium of trusts, without livery, and by operation of that statute, legal estates of freehold may now be created the same way. Those who framed the statute of uses, evidently foresaw that it would render livery unnecessary to the passing of a freehold, and that a freehold of such things as do not lie in grant, would become transferable by parol only, without any solemnity whatever. To prevent the inconveniences which might arise from a mode of conveyance so uncertain in the proof, and so liable to misconstruction and abuse, it was enacted in the same session of Parliament, that an estate of freehold should not pass by bargain and sale only, unless it was by indenture enrolled.” See stat. 27 H. VIII. c. 16; Harg. Co. Lit. 48, a. n. 3. To this I shall add the opinion of Ch. J. Holt, and the whole Court, in 12 Mod. 162, 163, who says, “if a bargain and sale were made of a man’s lands on the payment of money, the use would have raised, without deed, by parol. So, where there was a transmutation of possession, there needed no deed, but only the bare appointment of the party.” And again. “If a man for money aliened and granted his land to one and his heirs, by this a use was raised by construction, and it amounted to a bargain and sale; and so it is in Pox’s case, 8 Co. 94, a.” On the case here mentioned by Lord Holt, I shall just remark, that it was decided in 7 Jac. I. three yeax's after the epoch to which our law refers, as to the obligation of British statutes in this Commonwealth; and that the question upon which it was decided arose in 31 Elia, a few years only before.
To these authorities I shall add that of Lord Coke, in 2 Inst. 676, who says “it was resolved by the opinion of the Justices of both Benches, that a bargain and sale for a valuable consideration of houses or lands in London, &c. by word only, is sufficient to pass the same ; for that houses and lands in any City, &c. are exempted out of the act of 27 H. VIII. c. 16, concerning enrolments of deeds : and at common law, such a bargain and sale by word *only, raised a use. And the statute 27 H. VIII. c. 10, doth transfer the use into possessionfor which he cites Dyer, 229. Chilbern’s case, 6 Eliz.
Having had occasion to mention the statute of enrolments, 27 H. VIII. c. 16, whereby it was declared, “that no manors, lands, ten *688 ements, or hereditaments, (except in Cities, Boroughs, or towns corporate, wherein the mayors or other officers have authority to enrol deeds,) shall pass or change from one to another by reason only of any bargain and sale thereof to be made, whereby any estate of inheritance or freehold shall be made, or take effect in any person or persons, or any use thereof to be made, except the same bargain and sale be made by writing indented, sealed and enrolled in one of the King’s Courts of Record at Westminster, or else within the County or Counties where the same lie, or be, before the Custos Rotulorum, and two Justices of the Peace,” &c.
I shall now observe, that this statute never was in force in this country; 1st. Because the provision of it, as to enrolling deeds in the King’s Courts at Westminster, was either wholly impracticable, or highly inconvenient ; 2dly. That in this country there never was any such an officer as the Custos Rotul-orum mentioned in the statute; 3dly. That the exception in respect to Cities, Boroughs and corporate towns, proves that even in England it was not a universal law of the realm: consequently, was not brought over hither by our ancestors. Whereas the statute of uses, was a universal law of the realm, made in aid of the common law, and, as such, was not only brought over by our ancestors, but was recognised by our Convention at the period of the revolution : consequently, whatever construction upon the statute, and the common law as altered thereby, was proper in England, in cases not within the statute of enrolments, or might now be made there, if the statute of frauds and perjuries, 29 Car. IX. c. 3, and other supplementary statutes had not been made there, may now be made in this country, except so *far as the law has been altered by our own Legislature, either before or since the revolution.
The point which I conceive to be proved by the authorities before cited, and the reasons in support of them, is, that a bargain and sale of lands in Virginia, for a valuable consideration by word only, is (unless there be some act of the General Assembly to the contrary) sufficient to pass the same; for that at common law, such a bargain and sale, by word only, raised a use, and the statute of 27 H. VIII. c. 10, transferred the use into possession : not a possession in law only, but (in the words of Lord Bacon) a seisin in fee; not a title to enter into the land, but an actual estate. Bac. Law Tracts, 338.
A bargain and sale of lands may be defined a real contract on a valuable consideration, for passing or transferring them from one to another.(a) And when made by word only, it is no way distinguishable, that I can discover, from a contract, or agreement, to the same purpose. The effect, where founded upon a valuable consideration, being the same under the statute, which executes bargains, sales, contracts, and agreements, in the same manner as it executes a feoffment, fine, recovery, or covenant : the former estate, right, title, and possession of the vendor, being instantly vested in the vendee, who by virtue of the statute has the lawful seisin, estate, and possession thereby vested in him to all intents, constructions, and purposes in the law. If then the last words of the statute be not perfectly nugatory, the moment that a bargain and sale for a valuable consideration was concluded between the parties the estate of the vendor was annihilated, and that of the vendee absolute to all intents and purposes in law.
Let us inquire then, if by any act of the-Legislature of Virginia, antecedent to our act to prevent frauds and perjuries, passed in the year 1785, the statute of uses hath been in this respect repealed.
The first act upon the subject, which I have been able to find, is that of 1710, c. 13, (edition of 1733,) whereby it is enacted, “that no-lands, tenements, or other heredita-ments *shall pass, alter, or change from one to another whereby an estate of inheritance in fee-simple, fee-tail, general or special, or any estate for life or lives, or any greater or higher estate shall be made or take effect in any person or persons, or any use thereof to be made by bargain and sale, lease and release, deed of settlement to uses of feoffment, or other instrument, unless the same be made by writing indented, sealed and recorded in the records of the General Court; or of that County where the lands shall lie,” &c.
This act is a transcript from the statute of enrolments, 27 H. VIII. c. 16, but extends its provisions still further, by requiring that not only deeds of bargain and sale, (the only conveyance mentioned in the statute,) but that deeds of lease and release, which were invented and brought into use to evade it, and deeds of settlement to uses of feoffment, or other instruments, should be executed, acknowledged, or proved, and recorded in the same manner. But in the year 1734, c. 6, the Legislature found it necessary to amend the act, after reciting so much of it as I have transcribed above, they say that it “was intended as a security to purchasers and creditors, but by the strict wording of it, had been construed to destroy all deeds-poll, though they be recorded, and to make void all conveyances not recorded, even between the parties, though in respect to them, recording be unnecessary; yet ways had been found out, and of late much practised, by making mortgages, marriage settlements, and deeds in trust, for long term of years, (which are not provided against,) to defraud both creditors and purchasers, and so to elude the only design of the act.” It then declares all conveyances theretofore bona fide made by deed-poll or otherwise, valid and binding between the parties and their heirs, though not before acknowledged, or proved and recorded, and then proceeds thus ; “and for a greater security to creditors and purchasers, be it enacted by the authority aforesaid, that all bargains, sales and other conveyances whatsoever of lands, tenements, and hereditaments, *whether they be made for passing any estate of freehold or inheritance, or for term of years, and all deeds of settlement upon marriage, wherein either lands, slaves, money, or personal thing, shall be settled or covenanted to be left or paid at the death of the party, or otherwise, and all deeds of trust whatsoever shall be void, as to all creditors, and subsequent purchasers unless they be acknowledged, or proved and recorded, according to- *689 the directions of the said act: hut the same, as between the parties, shall, notwithstanding-, be valid and binding.”
It seems to me very material to remark, that there is no such proviso in the statute of enrolments : from which, as I have before observed, our act of 1710 is literally a transcript, with the addition of some other words, which do not vary the sense of the statute, but extend it only to other conveyances besides deeds of bargain and sale, nor is there any such provision in the si atute of frauds and perjuries. IJnder the former, a deed of bargain and sale not enrolled according to the statute, is void between the parties, as well as others. Under the latter, a parol release, or livery of seisin by parol only, has the effect of conveying only an estate at will, except leases for a term not exceeding three years, &c.
Whatever doubt might have been entertained upon the strict wording of the first act, whether it had not invalidated all bargains, sales, contracts, and agreements concerning lands, though made for a valuable consideration, and bona fide, unless perfected and consummated by deed indented, sealed, acknowledged, or proved and recorded, pursuant to the act, this interpretation which the Legislature has given tis of its own will, intent and meaning, is sufficient to convince my mind that it was neither its intention to repeal the statute of uses, as to the effect of any bargain, sale, covenant, contract, or agreement between the parties, nor to require any other solemnity in the transfer of lands from one to another, as far as regarded the right, title, interest, estate, possession and seisin of the *lands as between the parties themselves, than was requisite or necessary before the passing of the act. For it could never be the intention of the act to let loose men from their contracts made for a valuable consideration, nor to drive them into a Court of Chancery to have them carried into execution and effect, (the very thing which, the statute of uses meant to prevent,) when that statute did of itself execute, and carry into absolute effect, every such contract, by transferring the use created or implied by the terms of the contract, into a legal estate, possession and seisin. And though as against creditors and after-purchasers the estate so created and transferred, may be defeasible, or void, for want of a deed recorded, yet as between the parties it is valid, ab initio : for a thing may be void for one purpose, and not to another ;(a) and until it is made to appear that a creditor or purchaser is affected, the estate as created by the act of the parties, and the operation of the law upon that act, is a legal estate, and valid to all intents and purposes between them. And to this effect is Hob. 166, as to fraudulent conveyances made by jointresses, or tenants in dower, upon the slat. 11 H. VII. which he tells us were good against the party, though void as to some others.
Perhaps it may be supposed that the words “bargains, sales, and other conveyances,” which are declared to be valid and binding between the parties, though void as to creditors and subsequent purchasers, extend only to conveyances in writing. To my apprehension, the word “bargains,” as well as the word “sales,” which are used as separate and distinct descriptive terms in this amendatory act, cannot be interpreted to designate that particular species of written conveyances, called a deed of bargain and sale. They are used in a more general and comprehensive sense, and signify a real contract for a valuable consideration, for passing and transferring lands from one to another ;(b) and as between the parties themselves, there was every reason for carrying them into complete effect as before, by virtue of the statute of uses: more especially where there was an actual transmutation of possession, *though no deed or writing was ever-made between the parties.
Again, if the exception in the statute of enrolments (from which our act of 1710, c. 13, is a literal transcript, with the addition only of some other kinds of conveyances, besides a deed of bargain and sale as before remarked) as to Cities and Boroughs, left the conveyances at common law, and the operation of the statute of uses, upon uses at common law, in full force and effect in London, &c. as was adjudged in Chilbern’s case, Dyer, 229, so that a bargain and sale, by word only, made of lands or houses in London for a valuable consideration, would be sufficient to pass the same ; I ask, whether the exception in the act of 1734, as to the operation of the act of 1710, whereby all bargains and sales and other conveyances whatsoever, are declared to be valid and binding between the parties, is not as strong as the other ? For where is the difference whether the exception be as to the acts of certain persons, or to acts done in certain places ? Considering then the act of 1734, c. 6, as containing an exception from the general provisions of the act of 1710, c. 13, whereby all bargains, sales, and other conveyances whatsoever, were, as between the parties themselves, left upon the same footing as before the making of the former of those acts, I consider a parol bargain and sale of lands in Virginia, for a valuable consideration, as between the parties themselves, as standing precisely upon the same ground under those acts, as a parol bargain and sale of lands or houses in London before the statute of frauds and perjuries, 29 Car. II. c. 3, which required all conveyances and contracts for the sale of lands, to be made in writing. These two acts were consolidated in the year 1748, c. 1, with this additional circumstance, that the last mentioned act declares all bargains, sales, and other conveyances whatsoever, valid and binding, not only between the parties themselves, but their heirs. And as it was during the period that this last act was in force that Black purchased, and M’Rae sold the lot in question *for a valuable consideration, which purcha.se and sale was moreover attended with an actual transmutation of possession(c) from the seller to the buyer, I am of opinion that whether M’Rae did or did not execute a conveyance for the lot to Black, the latter acquired a lega! estate, seisin had possession of the lot in question under the statute of uses ; valid and binding against M’Rae and his heirs, under the provisions contained in the act of 1748, c. 1, and defeasible only by the creditors of M’Rae or bona fide purchasers from him.
*690 In the last argument of this cause, it was Objected by the counsel for the defendant, that a woman was not dowable of a use at common law. Perk. s. 349. The same author says, s. 457, that there shall be no tenant by curtesy of -a use; yet the Court of Chancery in England has decided otherwise as to that point. Sir Jos. Jekyll(a) supposes it probable that the other books, where the same thing is said may be taken from the same authority : and that this might possibly be said with regard only to a demand of dower at law, and not in a Court of Equity. And as to the preamble to the statute of uses, he further observes, that there is room to think that the words, “that by uses men lost their tenancies by the curtesy, and women their dower,” ought not to be taken in a general sense, for the uses complained of were such as were created by fraudulent assurances, and were secret; but supposing all uses, before the statute, were thought to bar tenants by the curtesy and dower, even in equity, as well as law, yet it will not follow at this time of day, (and in this country,) that trusts of equitable interests are now to be considered here as they were then in England. Eor the statute of uses having converted the use created by the bargain and sale for a valuable consideration, into a legal estate, and seisin, in the bargainee ; and the statute of enrolments requiring that the bargain and sale should be in writing, never having been in force in Virginia, the bargainee became instantly seized of a legal estate, of which his wife might have been endowed, without any necessity for a deed, as I have before *shewn, and not merely of a use, or equitable estate; and although my construction of our acts of 1710, 1734, and 1748, in supposing that as betweén the parties themselves, and their heirs, no deed or written conveyance whatsoever, was necessary to pass lands, should be erroneous, still I think it undeniable, that before the passing of these acts of Assembly the- estate of the purchaser for a valuable consideration actually paid, accompanied with actual possession of the lands, was complete in law ; and thereafter the wife of the purchaser would have been legally entitled to dower in the lands; which differs the case essentially from that of a use, before the statute of uses. If then the operation of our acts of Assembly be this ; that what would have constituted a complete legal title and estate in lands, before the passage thereof, be now turned into a mere equitable title ; will equity refuse to the wife, that which she before was legally entitled to demand; and if she possessed power over the actions of her husband, might, by the aid of a Court of Equity, have reduced to a legal title, according to the requisitions of the statute during her coverture ; but having no such power, is obliged to postpone the demand of her right, until the determination of her coverture ? Change the parties, and equity will act as handmaid to the claim of the husband to his curtesy, though he might, during the life of the wife, have enforced the execution of a legal title. And will she refuse her aid to the weaker sex, where the right is the same, and the reason stronger ?
It was also contended, at the bar, that Black never was seised of the lot. But what isa seisin? I mean a seisin in deed, or in fact ? Does it mean either more or less than the actual possession of an estate of freehold, or inheritance ? Whether acquired by livery of seisin, or by a man’s own entry at common law; or by the seisin or actual entry of his feoffee, or trustee to uses, under the statute of uses. We are told by an ancient author, that an hour’s actual possession quietly taken, confers a seisin de droit, and de claime, whereof no man can disseise him that hath taken such possession, but that the party claiming in opposition *thereto must be driven to his action.(b) The word seisin, according to the opinion of Lord Thurlow, will extend to being seised of an estate in equity, (c) And Lord Ch. Baron Gilbert, in Coventry v. Coventry, at the end of Francis’s maxims, expressly says, “in all cases where an agreement is entered into in contemplation of a valuable consideration, when that is performed, it is but justice and conscience that the purchaser should have an immediate right and ownership in what he hath so purchased; and therefore a Court of Equity, before the execution of any legal conveyance, looks upon the party to be in immediate possession of such estate, and to have a power of devising and giving it away.” Is it not in proof that Black received the rents of this lot from Kirkpatrick several years before he sqld it to him ? Nay more, that M’Rae acted as his agent in the receipt of them for him ? If so, what further evidence of an actual peaceable possession by Black can be required? Is there not further proof were it necessary ? viz. the deed from Black to Kirkpatrick, (accepted no doubt by the latter, as he after-wards appears to have paid the money for the lot, which he at first objected to,) in which the former expressly covenants that he is seised of an indefeasible estate in fee-simple in the lot. I concur with the Chancellor in thinking that Kirkpatrick, by this deed, was estopped from denying that Black was actually seised in fee. Suppose Black had been only a tenant for years, or at will, and had. made a feoffment in fee of the lot, his wife would have been entitled to dower. Eor by the feoffment he would have gained a fee (though but for an instant) by disseisin, and the feoffee was bound thereby, (d) Eor where a husband tortiously gains an instantaneous seisin, as against the person benefited by, and deriving an estate in virtue of, such tor-tious act, the wife is entitled to dower, and the feoffee can never plead that the husband was never seised.(a) Now Black was either the owner of the lot, or a disseisor, and either way the purchaser from him, with a covenant that he was seised in fee-simple takes an estate to which his wife had title of dower. Eor although Black’s estate might have *been a defeasible one at law, yet as he was never ousted during the cov-erture, his wife shall be endowed against the purchaser, (e) But if my conclusions from *691 the operations of the statute of uses be just, Black had an indefeasible estate in the lot, at the time that he sold to Kirkpatrick, even against M’Rae himself. For having" attained peaceable possession in consideration of money paid, his title was perfect without any deed; for the moment the bargain and sale for a valuable consideration was concluded, M’Rae became seised to his use, and the statute transferred the seisin and possession to him. And when in virtue thereof he had actually entered, there was juries et seisin® conjunctio.
The case of M’Clcan and Copper in this Court,(a) may be considered as against me. But there is a wide distinction between the two cases. In that, Arrell entered in 1776, upon lands to which he had no other title than a title-bond to Rigdon, assigned to Arrell in February, 177S, by Rigdon’s widow, claiming the land under a residuary devise in her husband’s will ; neither of whom are found to have ever possessed the land. A bond to convey is prima facie evidence that no conveyance or title has been made either by deed or otherwise. Arrell never had any other than an equitable title : First, such a bond never could be considered as a conveyance, but was evidence to the contrary. Secondly, such a bond was not assignable at law. Thirdly, neither the husband or his widow are found ever to have had possession of the land, so as to make a legal conveyance to Arrell. Fourthly, Arrell’s entry, though said to be made in consequence of the bond, was not at the time of the assignment, but a year after. Whereas Black purchased from Allen M’Rae, whose title and possession are not disputed, and was either put into possession by him in consideration of money paid, or else he entered with M’Rae’s approbation and consent, as it clearly appears he after-wards received and paid over the rents for Black as his agent. These circumstances constitute a wide difference between the two cases. It has more than once, I believe, been decided in this Court that parol marriage agreements respecting *lands, were valid even after the act of 1748, c. 1, against all subsequent purchasers of the lands, except such as were for a valuable consideration. Thornton v. Corbin, 3 Call, 384, is expressly so. This is a strong case in support of my construction of other parol agreements upon a valuable consideration executed by delivery of actual possession.
Another point insisted on by the counsel for the defendants was, that if Mrs. Black were dowable against the heir, or against a purchaser with notice, she cannot recover against a purchaser who has united the legal and equitable estates without notice of the marriage ; or against his vendee, though he had notice. But it must be recollected that all this objection goes to dower in an equitable estate. Now I have shewn that Black’s estate was not merely an equitable but a legal estate. And this Court has expressly declared that though equitable rights may, in favour of fair bona fide purchasers for valuable considerations, and without notice, be lost by a sale, legal rights never can, unless there be frauds, (which is not alleged in this case,) for in cases of legal rights the principle of caveat emptor properly applies, (b)And the very page (2 Black. Com. 132), referred to for the purpose of defeating the plaintiff’s claim, informs us, that where dower is allowable, it matters not though the husband alienes the lands during the coverture, for he alienes them liable to dower, (c) And cases are not wanting where Courts of Equity have interposed to the prejudice of a purchaser without notice of the plaintiff’s title as dowress.(d)
A third objection (the 5th contended for by the counsel for the defendant) is, “that if the plaintiff had remedy, it was at law; and that the failure of exception to the jurisdiction of a Court of Equity cannot confer jurisdiction.” Milford, a writer often cited and relied on in this Court, says, that in some cases, as in matters of account, partitions of estates between tenants in common, and assignment of dower, a Court of Equity will entertain jurisdiction of a suit though remedy might perhaps be had in the Courts of Common haw. That in the case of dower the *widow is often much perplexed in proceedings upon a writ of dower at the common law, to discover the titles of her deceased husband to the estates out of which she claims her dower, &c. that Courts of Equity having gone the length of assuming jurisdiction in the cases before mentioned, seem by degrees to have been considered, as having on these subjects a concurrent jurisdiction with the Courts of Common Law, in cases where no difficulty would have attended the proceeding in these Courts, (e) The authority of this passage in Mitford, though not supported by any case cited in the treatise, was acknowledged by Eord Ch. J. Eough-borough, in Munday v. Munday, 2 Ves. jun. 129. In this country, the practice in the County Courts has, I believe almost invariably, been to assign dower upon a bill in equity. The reason probably was, that by that means, dower was assigned, and distribution of the slaves and personal estate made, by one set of commissioners, appointed for that purpose by the Court. Here indeed no such reason occurs. But the loss of a deed from M’Rae to Black is made the foundation of one (or perhaps all) of the bills. The supplemental bill filed in April, 1800, alleges, that the plaintiffs had a short time before that discovered that the surviving defendants to their former amended bill, had attempted to elude their claim by procuring a conveyance from John M’Rae, styling himself son and heir of Allen M’Rae, for the lot, and that they had afterwards conveyed the same to the other defendants. This deed is admitted (or perhaps insisted on) by all the defendants in their answers.
Though x>robably as little disposed to favour the undue extension of the jurisdiction of Courts of Equity as any Judge that has set upon this bench, this circumstance alone is sufficient to induce me to decide in favour of that jurisdiction in this particular case. For, to what purpose could a con veyance from the heir o f Allen M’Rae have been *692 obtained by the defendants ? Clearly to prove, by deducing' a title from M’Rae, instead of Black, that she had no title to recover dower at law, on the presumption that Black never had a legal title from M’Rae ; and thus to bar her from a *recovery either at law, or in equity : for if that deed could operate as an equitable bar, much more might it be set up as a legal one. It was accordingly insisted on in the argument that the defendants did not claim under Black, but M’Rae. This conduct of the defendants, whatever other ground of objection there might have been to sustaining the bill, does in my opinion invalidate everything that can be said against the jurisdiction of the Court. And the Court being possessed of the causes, will proceed to decree relief, without turning the party round to another tribunal; unless indeed one circumstance should make it necessary to award an issue to be tried at law to determine the fact of the complainants’ marriage. See Curtis v. Curtis, cited 2 Ves. jun. 126, where it is said that the marriage being denied, Fd. Bathurst, Chancellor, sent the parties to law to try that.
It was, however, contended at the bar, that this was a mere trust, which the statute of uses could not execute. If this observation was intended to distinguish it from a use at common law, I conceive it has been already sufficiently answered. For before the stat. 27 H. VIII. c. 10, a use, confidence, or trust, were the same. And, as I have already shewn, a bargain and sale of lands fot a valuable consideration, though made by parol only, raised a good use at common law. (a) Will the calling it a trust change the nature of it, or prevent the operation of the statute ? Fd. Ch¡ J. Holt tells us otherwise : a use, which at common law was a trust of a freehold, or inheritance, is executed, as he tells us, by the statute which mentions the word trust, as well as use; and trusts at common law and uses are equally executed by the statute, (b) We are moreover tpld, that whatever was, or would have been a trust at common law is since the statute of uses executed, (c)
We are told that there are three ways of creating a use or trust, which the statute cannot execute ; 1. Where a use is limited upon a use. 2. Where a term of years is created, and limited in trust. 3. And lastly, where lands are limited to trustees to pay over the rents and profits to another. S Bac. Abr. 379, old ed. 1 Fq. Ca. Abr. 383 ; 2 *Fonb. IS, 16, and 2 Black. Com. 33S, 336, where the origin, foundation, and reasonableness of these several distinctions are briefly examined. To these we may add trusts arising by operation of law, which it has been said, have been but of two kinds: 1st. Where the conveyance has been taken in the name of one man, and the purchase money paid by another ; or, 2d. Where the owner of an estate has made a voluntary conveyance of it, and made a declaration of the trust with regard to one part of the estate, and has been silent with regard to the other part of it. These, it is said, have been the two only instances of a trust allowed, to arise by operation of law, since the statute of frauds, 29 Car. II, unless there had been a plain or express fraud. S Bac. Abr. 390, old ed. Mr. Gwyllim in his edition, suspects the fidelity of the reporter in this passage, and actually enumerates several other cases of resulting trusts in equity. But not one of them that bears the smallest resemblance to the present case : I shall therefore pass them over; and it would be misspending time to shew more at large, that none of the cases enumerated above, bear the smallest analogy to it. Consequently, the position assumed by the counsel for the defendant, that this was one of those trusts which the statute of uses could not execute, appears to be unfounded, both from negative and positive authorities.
As to the cases in which dower has been refused out of a trust estate, neither the cases, of Fady Radnor v. Vanderbendy, Show. Pari. Cas. 69, nor Colt v. Colt, cited 2 P. Wms. 640, 1 Ch. Rep. 2S4, nor Bottomly v. Fairfax, Prec. in Ch. 336, nor Brown v. Gibbes, same book, 97, nor Chaplin v. Chaplin, 3 P. Wms. 229, nor Attorney-General v. Scott, Cases temp. Talbot, 138, nor Godwin v. Winsmore, 2 Atk. 525, nor Dixon v. Saville, 1 Bro. Ch. Rep. 326, nor Wray v. Williams, Prec. in Ch. 151, more fully stated in 1 P. Wms. 137, nor Swannock v. Fyford, Amb. Rep. 6, nor any other case in which the widow has been refused dower in equity, that I have been able to meet with, bear any analogy to the *present. But the case of Dobson v. Taylor, cited from the reports of a gentleman as eminent at the bar in his day, as most of those-who have succeeded him in practice in this, country,(d) is a case resembling, and even stronger than the present. The circumstances of that case were : Taylor agreed to convey to Anderson his houses in New-Castle, on the first of March, 1750, for the consideration of 1,0001. payable at respective times. The first payment was to be April 1, 1751. Anderson died after the time Taylor was to convey, and his wife in prospect of this dower in the house, parted with her thirds in other lands which Anderson sold. After Anderson’s death, (who was insolvent,) the question was, as Taylor had not conveyed, whether the wife of Anderson was dowable of this equitable interest. And it was decreed unanimously, with the exception of only one of the Court, that the widow was entitled to her dower therein.(e) And there the former General Court of this country, whose decisions have always been held and treated with respect by the Judges of this Court, in all cases where no contrary decision has taken place here, has with me the greatest weight, as settling this question near sixty years ago, in favour of the widow’s right of dower in lands bona fide purchased for a valuable consideration, agreed for by the husband, and with th$ consent of the seller, entered into by the purchaser, and held by him though no deed for the same was ever executed.
Whether the Court in the decision of that case, proceeded upon the ground that the-estate of a purchaser for a valuable consideration, is after entry and peaceable possession taken and held by him, with the consent of the seller, a legal, or merely a trust, or equita *693 ble estate, is immaterial in my mind. If the Court considered it in the latter point of view, I think it probable they thought, that where there was an agreement to •convey to the husband at a certain time, •so that the legal estate ought to be consolidated with the equitable estate, there it should operate as if it had actually been done. So that a woman should be *dowable of an equitable estate, where that equitable estate ought to have been turned into a legal one ; as was argued by the counsel in that case. And this seems probable, as the purchaser died insolvent before any actual payment was made, though possibly bond for the purchase-money had been given. If equity, as defined by the writers on that subject, stands for the whole of natural justice ;(a) if natural justice respects not the difference of persons or of sexes ; if marriage be a civil contract; JBro. Ch. 249, made upon a valuable consideration ; 2 P. Wms. 636, if trust estates are to be governed by the same rules, and are within the same reason as legal estates; 1 P. Wms. 109, if it will be productive of the greatest uncertainty, if the rules of property be not the same in all Courts ; Ibid. 109, if dower be more favoured in law, and reason, than curtesy ; 2 P. Wms. •644. “I cannot but wonder with the able and enlightened Master of the Rolls, (Sir Joseph Jekyll,) how it ever came to be thought, that a tenant by the curtesy, was entitled to relief in equity, more or farther than a dowress ; and particularly that a tenancy by the cur-tesy might be of a trust estate, but not dower; which is no less than a direct opposition to the rule and reason of the law, allowing dower of a seisin in law, but not a tenancy by the curtesy, because the wife •cannot gain an actual seisin, but the husband may ; which reason holds in a trust estate, for the wife cannot gain or compel a trustee to convey the legal estate to the husband, but the husband himself may ; therefore, if any distinction is to be made, dower (one would think) ought to be preferred to curtesy.” 2 P. Wms. 638. This reasoning is more convincing to my mind, than all the oracular responses that have been made to it since. Vide 1 Black. Rep. p. 160,161, per Cord Mansfield. And I am happy to feel the confidence T. repose in this train of reasoning, supported and confirmed by the first tribunal in this country sixty years ago ; a tribunal which, as long as it existed, had the aid of as great talents at the bar, as any that ever assisted the deliberation of any Court in this quarter of the globe ; and *was composed of men, who probably understood the laws, usages, and constitutions of this country, better than any Judge in any other country whatsoever : nor ought it to pass without notice, that the oath of a Judge in Chancery for more than a century past, enjoins him to decide according to the laws and usages of Virginia, not of England.(b) They found themselves, happily, under no necessity of conforming their better judgments to the practice of conveyances, as we are told by Cord Camden, Arab. 681, was the case with the House of Cords, in the decision of Cady Radnor v. Vanderbendy. If such a circumstance will justify that tribunal for departing from the general principles of law and equity, much more will a knowledge of the circumstances and usages in this country, support and justify the decision of the General Court, in conformity to these principles.
In this country mortgages and deeds of trust are every day’s practice ; and they are generally made in fee-simple. But I have scarcely ever known an instance of a recon-veyance made by the mortgagee or trustee, although the mortgage or trust debt may have been fully satisfied and paid. If the widows of mortgagors are not dowable in such cases, there are few widows in Virginia who may not be denied their dower in estates which have long been disincumbered, the legal title to which may still remain in some trustee, or mortgagee, or their heirs, although the possession has never been out of the mortgagor.(c) The counsel for the defendants have likened this to the case where a man previous to his marriage, makes a conveyance whereby he departs with the inheritance, in order to bar his wife of dower, as is said to have been done by Sergeant Mayor-ard,(d) urging that Black in not requiring a deed to be made to him at the time of the purchase, but having sold the property, shewed he intended his wife should not have dower. How far the case to which this is likened may be a good bar of dower, if such a conveyance were made in contemplation of a marriage, it will be time enough to decide when it happens. But the evidence arising from Black’s own letters *to M’Rae, (annexed to John M’Rae’s answer,) proves the contrary to this supposition of the defendant’s counsel, and leaves no room for such a conclusion as he has drawn. He was anxious to obtain a deed.
The next point which I shall notice, is the 3d objection on the part of the defendant. That the Court of Chancery had no jurisdiction at the time of the decree, over real estate in the District of Columbia, to effect an allotment of dower.
The act concerning the District of Columbia, 6 Cong. c. 86, (2 Sess. c. 15, s. 1,) continues the laws of Virginia in force in Alexandria. And section 13, provides for execution of judgments and decrees in suits then depending in the Courts of Virginia and Maryland. And our law of 1792, c. 151, s. 53, authorises the issuing from the Court of Chancery, writs of habere facias possessionem, or any judicial process which may issue from any Court of Common Daw, according to the nature of the case. Consequently, if the plaintiff in this case be decreed to have her dower in the lot, the acts of Congress points out the method how that decree might be carried into effect without difficulty according to the law of Virginia. Besides, as to those parties who reside within the State, there can be no doubt that the Court can enlorce its decree, as if the cession to the United States had never been made. Upon the point of Mr. Henderson’s liability, I conceive that having renounced the executorship, and the trust connected with it, his having drawn the conveyance, (even if that fact were proved,) which I think is not the case, was *694 not such an act as would make him liable, either as an executor or trustee, and consequently that as to him the bill ought to have been dismissed. But that in other respects the principles of the decree should be affirmed.
JUDGE ROANE.
This is a bill exhibited by the appellee to recover dower in a lot in the town of Alexandria ; to which the ap-pellee, Mrs. Claiborne, claims title, as widow and relict of William Black, deceased. Prior to the year 1760, the *said William Black purchased the said lot from Allen M’Rae, for which he paid a valuable consideration, but received no conveyance ; nor is it even shown that the purchase was evidenced by any writing. In January, 1762, he intermarried with the female ap-pellee : in 1766, he contracted to sell this lot ■ to Kirkpatrick, for which in May, 1773, he passed to him deeds of lease and release; and in 1782, Black died, having, by his will, which his widow duly renounced, made a provision for her, of. property other than the lot in question, of which lot, also, no mention whatever was made in the will. Black was possessed of the lot in question before and after his marriage with the appellee, and until he sold it to Kirkpatrick, for a valuable consideration, by him duly received. The appellants Henderson and Gibson are sued as surviving trustees and executors of Kirkpatrick, who directed the property in question to be divided between certain dev-isees. Kennedy purchased the lot of the said executors and the heirs of Kirkpatrick in September, 178S, and then sold a moiety of it to Wilson ; neither of whom had any notice of the present claim, except such as may be construed to have arisen from the pendency of the present suit; and Ramsay had been a previous purchaser, but had relinquished his purchase, conceiving there was a doubt about the title. In 1786, John M’Rae, the son and heir of Allen M’Rae, conveyed the lot of which the legal title was still in him, to the executors of Kirkpatrick, by a deed reciting the sale by Black to Kirkpatrick, and in consideration of Ss. which executors conveyed the same to Kennedy and Wilson in 1795 ; and afterwards a defect being discovered in their deed, in relation to the number of the lot, a deed was renewed to them for the same by John M’Rae.
The appellees, justly sensible of the objection which lay against a claim of dower in a trust estate, or a mere equitable title, alleged in their bill that a deed had been duly made by Allen M’Rae to William Black for the lot in question shortly after the purchase ; which being confided to Ellzey to have it recorded, was by him lost: they pray a discovery as to this point, and that the said deed may be *set up by the Court of Equity. Although there is no iota of proof that such deed ever existed, this allegation would, if it were otherwise necessary, (which it is not, under the established doctrine on this subject,) suffice, perhaps, to repel the objection to the jurisdiction of a Court of Equity to sustain a suit for dower.
There is no position in the law more undeniable than that a vendor of land, after a contract for a purchase, and before a conveyance is executed, is a trustee for the vendee. This is so established a principle, that although almost every page of the reports in equity act upon it as a settled doctrine, it is perhaps not easy to find modern authorities laying down the position in so many words : it is certain, however, that it has been considered as an established principle at least as early as 13 Car. II, as may be seen in the case of Davie v. Beversham, Rep. in Chancery, vol. 3, p. 2. This position emphatically applies to the case before us, in which, so far from being a conveyance executed, there is not even a written memorandum, stating the terms of the purchase, or the extent of the interest contracted for. This case then is that of a claim of dower by the widow of a cestuy que trust of lands, the legal estate in. which remained in another.
Erom the evidence in the cause it appears, that in 1760, (before Black’s marriage,) he wished a conveyance of the legal estate to be made to himself : (see his letter to Allen M’Rae of May 22, 1760 :) but there is no testimony whatever that he wished this to be done after his marriage : on the contrary, from the time of his contract with Kirkpatrick, he appears to have wished the deed to be made directly to Kirkpatrick ; thus avoiding the trouble, circuity, and risk attending the procurement of his wife’s relinquishment of dower, after an intermediate conveyance to himself. [See his letter of November 3, 1764, and his two letters of July 20, 1767, stated in the record.] The answer of John M’Rae, also, who was possessed of and had searched all his father’s books and papers, states his belief, that from the year 1764 till! 1766, a conveyance was “probably not desired by *William Black, but suspended in order to be made immediately to a purchaser, who seems during this period to have been sought for.” The evidence of of intention therefore arising out of these circumstances falls very strongly within the reason of a distinction taken, as a general one, (but since exploded.) by Sir Joseph Jekyll in the case of Banks v. Sutton; namely, that although a wife is dowable of a trust created by a stranger, she is not dowable of one created by her husband; because in the latter case, (otherwise in the former,) the husband is presumed to have intended to bar her dower. On no other ground than the existence of such an intention in the case before us, can the abandonment by Mr. Black, of his purpose to obtain a deed to himself, from and after the time of his marriage be rationally accounted for.
If, therefore, it is not necessary (under the later and more approved decisions) for the appellants to array this evidence of intention against the claim of the appellees, there is certainly, on the other hand, no ground, of intention existing in the present case, which can be brought to act in their favour. The question then must be decided as a general! one.
But for the elaborate decree of the Chancellor, in the case before us, and the opinion just delivered by the Judge who preceded me, I should have deemed it unnecessary to have consumed much time, in deciding a case so plain ; for I hold it to be extremely clear, that, prior to our act of 1785, a woman was. not dowable of a trust estate. These re *695 spectable opinions have imposed on me the task of investigating' the subject somewhat at larg-e ; and it may not be unuseful, in a case of such importance, to state the authorities and reasons which have confirmed my former opinion. I will first refer to some adjudged cases upon this subject, and then notice the corroborative opinions of some elementary writers of high respectability. The cases which I shall cite have been some of them, considered en masse, inapplicable to the case before us, by the Judge who has gone before me. I differ from him, however, in this ^particular, as far as I do in respect of the authority and application of the case of Dobson v. Taylor, notwithstanding the encomium he was pleased to pronounce on it, and the Court who decided it.
With this preliminary observation I proceed to examine some of the cases and authorities. In the case of Bottomly v. Fairfax,(a) it was held that if a husband before marriage conveys an estate to trustees in such a manner as to put the legal estate out of him, though the trust be limited to him and his heirs, of this trust-estate his wife shall not be endowed. It is not easy to discern a difference between that case and the one at bar, unless it be said (in conformity to the distinction before noticed to have been taken and since exploded) that the trust in the case at bar was created by a stranger, andin the case of Bottomly v. Fairfax by the husband himself : but it is certain that, in both cases, the trust was created by the husband : in the last case, it is true, by making a positive conveyance in trust ; in the case at bar, by merely omitting to procure a legal conveyance. The husband, however, is the efficient person in both cases, and the difference does not exist in substance but merely in form. If that exploded distinction could ever have justly applied to any case, it must have been to one wherein the husband was merely passive, one in which the “trust descends or comes” from another (see Godwin v. Wins-more, post) who could not be presumed to have intended to bar dower. That is not the case, in the present instance : but if the husband were even considered as merely passive, touching this estate in its origin, the before mentioned testimony shews, that from and after his marriage, he came forward and wished (by waiving a conveyance to himself) to keep up the trust-estate, until it became a legal one in his vendee, Kirkpatrick, by an immediate conveyance to him from his vendor M’Rae.
The case of Banks v. Sutton,(b) decided by Sir Joseph Jekyll, Master of the Rolls, in 1732, was in substance as follows. Hancock mortgaged land in fee to Ward. Hancock afterwards devised his real and personal estate to Sir W. Filis, *in trust, to pay debts and legacies, &c. and then to settle on Robert Sutton and his heirs, on his attaining the age of twenty-one years, a moiety of his estate. Hancock died. Filis entered on the lands, and possessed the personal estate; paid off the mortgage, and took assignment of it to himself, &c. Robert Sutton attained the age of twenty-one, and married : the estate was not settled on him ; and after his death, his widow was decreed her dower in the trust-estate, and in the equity of redemption of the mortgage. That case was very elaborately argued by the Master of the Rolls, but has been since overruled. If, however, it were not so, it would be no authority against the present appellants. As to the dower in the general trust-estate, it was decreed on the ground that that estate had been created by a stranger, (Hancock,) from which circumstances it was argued that no intention to bar dower could be in ferred ; and also on the ground that a time was limited for conveying the legal estate, viz. Robert Sutton’s attaining twenty-one years of age, and had arrived in the lifetime of the plaintiff’s husband; and it was decided that the principle, that what was agreed to be done should be construed as if it were done, sustained the claim of the widow. In both these respects that case is different from our’s ; (but if it were not so, both those grounds of decision have been overruled ;) for 1st. In our case no time was limited (nor had arrived, during the marriage) for the legal conveyance to be made ; and 2dly. The trust-estate was here created by the husband, originally ; or if this be not so, his intention to dispense with a legal conveyance to himself, commenced with his marriage, and continued during the whole period thereof. Admitting, therefore, that this decision (in Banks v. Sutton) was correct, as applying to that particular case, it would not embrace the case before us. This is made more manifest by the following passage in the opinion of the Master of the Rolls: “but after all these reasons and authorities, I must declare that I would not take upon myself to determine whether a wife should *have dower out of a trust of inheritance, where it is created not by the husband, but by some other person,” (he had previously said that, of a trust created by the husband, the wife shall not have dower,) “and no time limited for conveying the legal estate : when that comes to be the case it will be time enough to do it; but the present differs very much from the common case of trust-estates, in that there is a time limited for conveying the legal estate, and that time come in the life of the plaintiff’s husband. ” As to his decision, that the wife was dowable of the equity of redemption of the mortgage in fee, that is not the case before us ; it is, however, but another side of the same question, (for a mortgagor in fee, after the mortgage money is paid, is a cestuy que trust of the inheritance,) (c) and has since been often overruled.
In the case of Chaplin v. Chaplin, in 1733, (d) it was decided by Ford Chancellor Talbot, after much debate and consideration, that the wife of a tenant in tail in trust of a rent (created by a stranger) was not entitled to dower in it. After taking up the case of Banks v. Sutton and the cases therein cited, and giving answers to (or overruling) them all, he proceeds to say, “that a woman is no more dowable of a trust now than she was of a use before the statute; that it had been the constant practice of conveyancers, agreeably thereto, to place the legal estate in trustees on purpose to prevent dower; *696 wherefore it would be of most dangerous consequence to titles, and throw things into confusion, contrary to former opinions and the advice of so many eminent and learned men to let in the claim of dower upon trust estates ; that he took it to be settled that the husband should be tenant by the curtesy of a trust, though the wife should not have dower thereof; for which diversity as he could see no reason, neither should he have made it; but since it had prevailed, he should not alter it; that there did not appear to be so much as one single case, where, abstracting from all other circumstances, it had been determined there should be dower of a trustand he dismissed the bill so far as it claimed 'Mower in the trust in question. The reporter adds, in a note, that afterwards, in the case of Shepherd v. Shepherd, (March, 1735,1736,) heard before Tord Talbot, the same point coming in question, the Attorney-General and Mr. Fazakerley, who were of counsel with the widow, apprehended it to have been so clearly settled by the above resolution, that they both declined speaking to it.
In the case of the Attorney-General v. Scott, (in 1735,) before the same Chancellor, (a) it was decided that the widow of a cestuy que trust of an estate in fee which was mortgaged was not entitled to dower. The case of Banks v. Sutton and others being cited, the Bord Chancellor said, “The question is very considerable, and very proper to be settled. Dower is properly a legal demand, and here the estate is limited to trustees and their heirs, to the use of them and their heirs ; so that it is actually executed in the trustees, and whatever comes after can only be looked upon as an equitable interest: for there cannot be a use upon a use. The question therefore is, whether the feme of the devisee shall be entitled to dower at law ? No dower was of a use before the statute ; it being entirely a legal demand ; (b) and then how can she be dowable of a trust after the statute, since no difference can be assigned between a trust now and a use before the statute, and Courts of Equity must follow the same rules now as to trusts, as prevailed before the statute as to uses. How the difference now received between tenant by the curtesy and tenant in dower ever came to be established I cannot tell; but that it is established is certain ; nor have I heard of any case cited to the contrary, but that of Fletcher v. Robinson,” (a case much relied on in Banks v. Sutton, and overruled in the case of Chaplin v. Chaplin,) which was determined upon another reason that does not affect the present case. That of Bot-tomly v. Fairfax (ante) is an exact authority that a woman shall not be endowed of a trust, and the received practice of inserting trustees to bar dower would otherwise be of no signification. For me, therefore, to do a thing merely upon the authority of *an obscure case, (Fletcher v. Robinson,) which does not seem to have been determined upon that point neither, and that might, perhaps, shake the settlements of 500 families, is what I cannot answer to my conscience.”
When the Bord Chancellor here says that he has not “heard of any case, cited to the contrary,” it is evident that he did not consider the case of Banks v. Sutton, as going to the general doctrine ; and thus his construction thereof accords with the ideas I have before stated upon that subject.
The case of Godwin v. Winsmore, in 1742, (c) before Bord -Chancellor Hardwicke, was a bill by a widow for a customary estate. The husband’s father bought the lands which were conveyed to him and D. and the heirs of the father : the father dies after devising the lands to the husband in tail: D. survived the husband: the bill was dismissed; and, by the Bord Chancellor, “it is an established doctrine now that a wife is not dowable of a trust-estate : indeed a distinction is taken in Banks v. Sutton, in regard to a trust where it descends or comes to the husband from another, and is not created by himself ; but. I think there is no ground for such a distinction, for it is going on suppositions which hold on both sides ; and at the latter end of the report Sir Joseph Jekyll seems to be very diffident of himself, and rested chiefly on another point of equity ; so that it is no authority in this case. But there is a late authority, in direct contradiction to the distinction above taken in Banks v. Sutton, before Bord Talbot; the case of the Attorney-General v. Scott.” (ante.)
In the case of Casborn v. Inglis, (1737,)(d) Bord Hardwicke held, that if a woman seised of land, mortgage it, and marries, and the mortgage be not redeemed during the cov-erture, the husband shall be tenant by the curtesy : he admits the distinction before noticed between curtesy and dower, and says that “if any innovations were to be made, it would be the nearest way to right, to let in the wife to dower of a trust-estate, and not” (as was contended) “to exclude the husband from being tenant by the curtesy of *“it.” And in Dixon v. Sa-ville, in 1783, (e) it is directly decided that where the husband died seised of the premises in fee, the estate being mortgaged in fee before the marriage, and still continuing so, the wife is not entitled to dower. It was so decided, notwithstanding the husband had made no provision for his wife, except by giving her a carriage and horses, thinking, as his counsel argued, that his wife would be entitled to dower : and the Chancellor very briefly said that the “law was so much settled that he thought it wrong to discuss it, and that the argument in the cases cited” (on behalf of the wife) “has generally sprung from compassion.” In that case the argument from compassion eminently existed and yet was overruled; whereas, in our case, -the wife had, by the will of her husband, an ample provision, which, however, she rejected, and is now in possession of her legal share of his estate. In that case, too, the husband was not only seised of the land during the coverture, but died seised ; whereas, in the case at bar, although the husband was entitled to the land during the coverture, he did not die seised, but on the contrary had sold it for a valuable consideration duly received; a part of which, either in the shape of real or per- *697 onal estate, the appellees are probably at this moment enjoying. That case then is stronger than the one before us, and would seem to be a conclusive authority.
As to the case of Dobson v. Taylor, April General Court, 1751,(a) it was eminently a case of compassion. The wife of Anderson, in consideration of this dower in the equitable interest, parted with her thirds in other lands sold by her husband ; whence it was argued that the wife was a purchaser of the interest in question ; and, besides, her husband had died insolvent, so that she would have been wholly destitute of support had she not prevailed in this instance. It is also to be remarked that Anderson, the husband, died “after the time Taylor was to convey” the houses, which is a circumstance very much relied on by the Master of the "Rolls, in the case of Banks v. Sutton, as before -mentioned; whereat,, in the case before us, no time was limited for the ^'conveyance, nor consequently had arrived during the coverture. In these respects, however, the case of Dobson v. Taylor is widely different from the case before us: respecting this case I can say with Lord Talbot, in the case of Chaplin v. Chaplin, (ante,) that “it ij> nota case in which abstracting from all other circumstances, it has been determined that there should be dower of trust.” Admitting, therefore, the authority of the old General Court, to establish the law on this subject, in derogation of the decisions of the Court of dernier resort, in England, and admitting also the correctness of the decision as it applied to that particular case, (neither of which admissions am I at present prepared to make, it does not follow that that decision is a conclusive authority for the appellees, in the case before us.
On the subject of precedents, I will beg leave to say, that it has never been pretended that the decisions of the old General Court have been considered conclusive as to rules of property, except in relation to subjects peculiar to Virginia, (slaves for example, ) or, perhaps, on other subjects where there has been a series of uniform decisions in that Court, establishing the rule, and none of which have been reversed by the Court of dernier resort in England. The most that has been contended for is, to place those decisions on as high ground as the decisions in the Courts of Westminster-Hall in England : (See the opinion of Judge Pendleton, in Wallace v. Taliaferro, 2 Call, 489,) but, as a series of uniform decisions by those Courts, would undoubtedly' overrule a solitary decision by o"e of them, (which by being single has perhaps not grown into a rule of property,) and, especially, when it is distinguishable from the other cases in particular and material circumstances; so, undoubtedly, would such a series of decisions by those Courts overrule a single decision of the latter class made by a coequal Court in this country, whatever may be the case of single and recent decisions which have neither been long acquiesced in, nor grown into rules of property. The sanction of this Court in relation to “uniform decisions which establish *rules of property” has been given in many cases; of which those of Minnis, Executor of Aylett, v. Aylett, (b) and Boswell v. Jones, (c) and which are strong, are at present recollected. As to the ideas of the English Courts on this subject of precedents, it will be seen that Lord Chancellor King declared in Chauncey’s case, (d) that he was not for breaking in upon a general rule, although he did not himself see the propriety of it: that, in Dawes v. Eerrers, (e) the Lord Chancellor interrupted the plaintiff's counsel, saying he would never suffer the bar to dispute what was the foundation and landmarks of the law ; though what they contended for might be reasonable if it were then to be first adjudged, yet, whatever the law was, provided it were known and certain, it would be well for the subject, though in some particular instances, it might be unreasonable; that in Dormer v. Parkhurst, (f) it was said to be the less evil to make a construction even contrary to the rules of the common law, than to overthrow 100,000 titles; and that in Evelyn v. Evelyn,(g) it is held that “successive determinations make the law.” To these I will add the doctrine of Judge Blackstone on this subject ;(h) “that precedents and rules must be followed, unless flatly absurd and unjust; for although their reason be not obvious at first view, yet we owe such a deference to former times as not to suppose that they acted wholly without consideration.” These are a few of the innumerable instances to be found in the books, of a reverence for decisions, and rules of property which have been established by the concurrent decisions of successive Judges, and acted under, for a long series of time. They ought to be adhered to as the sine qua non of all certainty and stability in the law, the private opinion of any single Judge to the contrary notwithstanding.
I come next to the corroborative opinions of certain elementary writers, of high respectability.
In the treatise of equity, on which Eon-blanque has annotated, which was published in 1737, and is a work of great merit, it is said, (vol. 2, p. 103,) that dower 377 is not allowed *out of a trust estate, nor was it anciently of a use,^ though no manner of reason can be given "for it if it were res integra ; but that the authorities are clearly so, and it would overturn many settlements to make an alteration in it; and in the notes by Eonblanque it is said to be now settled that there shall be no dower in a trust-estate of inheritance whether created by the husband or a stranger; and that it will not differ the case, if the husband has even obtained a decree directing the trustees to convey to him the legal estate; and in Ryal v. Rowle, (i) it is said by Lord Hardwicke, that the only case in which as to rules of property, Courts of Equity do not follow the law is that a woman is not dowable of a trust-estate. In 1 Eonb. 414, *698 it is said that money decreed to be laid out in land is considered as land, (on the principle that what is agreed to be done shall be considered as done,) inter alia, so as to be subject to the curtesy of the husband, but it will not entitle a woman to dower.
In 2 Black. Com. 128, it is said that tenant in dower is where the husband is seised of an estate of inheritance, &c. and, again, (a) the Courts now consider trusts either when declared or resulting by implication as equivalent to the legal ownership, &c. except that they are not yet subjected to dower; more, the author adds, from a cautious adherence to some hasty precedents than for many well grounded principle. It is true that I have seen no good reason assigned for the exclusion of the case of dower: but the foregoing cases shew that the law on this subject, if it arose originally from hasty precedents, has since been established by the solemn and deliberate adjudications of some of the greatest Chancellors who ever held the seals in England. These numerous and uniform ,decisions, would seem to conclude this question. But, before I dismiss the subject, I will beg leave to avail myself of the testimony of a late writer of our own country respecting it. In the new edition of Black. Com. vol. 2, p. 128, the editor, after transcribing, in his note, the act of 1785, upon this subject, adds, “in curtesy the law seems to have always been that a husband *might be tenant by the curtesy of a trust-estate, in some cases where a wife would not be endowed of such an estate: for, if the wife, make a mortgage in fee before marriage, (Casborn v. Inglis, ante,-) the husband shall be tenant by the curtesy of the equity of redemption; but, if the husband had made a mortgage in fee, and afterwards married, the wife could not be endowed of this equity of redemption. ”(b) Again, in p. 131, after again inserting the act of 1785, he adds, “In consequence of this act it would seem that a wife might now be endowed of a trust estate in some cases where it was formerly held, that she could not be endowed.” The editor then states several cases of trust-interests, in which he supposes she is now dowable, and in which it had been formerly decided otherwise; and adds, “In the case last cited, (Godwin v. Winsmore, ante,) Cord Hardwicke lays it down as an established doctrine, at that da3' that a wife is not dowable of a trust-estate, and that she was not dowable of a use before the statute of 27 Hen. VIII.” and in p. 337, after again transcribing the act of 1785 on this subject, the editor adds, “By this act the question frequently agitated in the English Courts of Equity, viz. whether a widow be dowa-ble of a trust-estate, seems to be decided.” If any thing further was necessary to shew that by the act of 1785, the law on this point was altered, and that aid might be derived from the terms of the act itself. They are that “where any person, to whose use, or in trust for whose benefit another is or shall be seised of lands, tenements, or hereditaments, -hath or shall have such inheritance in the use or trust as that, if it had been a legal right, the husband 'or wife of such person would have been entitled to curtesy or dower, such husband or wife shall have and hold, and may, by remedy proper in similar cases, recover curtesy or dower of such lands, tenements, or hereditaments.” (V. C. 1785, c. 62.)
This statute, in its nature prospective, does not purport to be a declaratory act; the character of which is that, “for avoiding all doubts and difficulties, it de-dares what the ‘common law is and ever hath been.”(c) It does not attempt the vain purpose, as some of our acts have sometimes done, by express words, to impugn and reverse the antecedent decisions of the Courts. It merely goes to alter the law in question, as to all those cases in which the rule as antecedently settled, might be at variance with „the standard set up by this act.
Sensible as I am that this great question, shaken by the decree in the present case and the opinion just delivered, ought for the public good to be fairly met and promptly decided, I have thus chosen to go somewhat at large into it. I am not sure that this was absolutely necessary in order to sustain tha case of the appellants in the present instance. Several subordinate points were made, which it will not be necessary for me to decide, (nor have I duly considered them,) unless the opinion of the Court were adverse to my own upon the principal question. This Court having imposed upon it the immense responsibility of settling the law of the country, (as well as deciding the causes of the suitors,) I am sensible that great mischief may result, as well from deciding too much, as from taking too wide a range in relation to what ought properly and necessarily to be decided. Eor this reason, I shall pass by, for the present, several topics which were urged in the argument, and several which are contained in the Chancellor’s decree. In that decree, however, there is one topic which I cannot entirely pretermit.
The decree states, that English Chancellors, for reasons peculiar to that country, or not existing in this, have denied the application of the maxim, “that what is agreed to be done shall be considered as done,” to the claim of dower, though they have admitted it to favour an estate by the cur-tesy. That venerable Judge may have known the peculiar reasons, which existed in England, and do not exist here, supporting the distinction as in that country, although the preceding authorities shew that the eminent Chancellors and writers I have quoted, were ignorant of such reasons. They took it up, as I shall, as a rule .of property, *which has been established, and which it is essential to the peace of the nation should be adhered to. If, however, in the darkness in which I am enveloped, as to the reasons of the rule, I should indulge myself in conjecture, I should say, without hesitation, .that the reasons were perhaps more strong in favour of the claim of dower in trust-estates in England than in this country. In this new country where many people hold their lands *699 by patent rights, where the deeds of conveyance are usually extremely simple, and conveyances in trust very rare, it is evident that widows would more generally be entitled to dower (under the existence of the principle in question) in our country than in England. In that country, settlements in trust, with all the paraphernalia of conveyancing, appear every day in all their variety: the right by patent is obsolete through lapse of time, and the simple modes of conveyance are comparatively rare. The interests of dower therefore called much more loudly for a change of the rule in that country than in this. But, while, for the foregoing reasons, in this country, the observance of the rule in question would but seldom have deprived a widow of her dower in lands permanently owned by her husband, the relaxation of it, prior to the commencement of the act of 1785, and its operation since, would, perhaps, in many cases where imperfect titles to lands not intended by the husband for permanent ownership have passed, or may pass, through many hands, as a species of merchandise, and on the transfer of which the husband has received, or may receive, a valuable consideration, which has')enured, or may enure, to the benefit of the wife, (as in the case before us,) clog those transfers with innumerable claims of dower, and otherwise be productive of infinite litigation and injustice.
The position taken by the Judge who preceded me, that the paying for this land, and gaining possession of it by Black, conveyed to him a legal estate in the premises, is at least a new idea in this country; it is at least a new' discovery. While hundreds of bills in equity have been brought to coerce deeds, under like circumstances, it is presumed *that no man, for the last century at least, has supposed that he could recover land in ejectment, on such a title. That common error, under which all the Judges, all the lawyers, and all the people of this country have so long acted, must outweigh all speculations to the contrary, however ingenious and elaborate. In the language of Blackstone, “we owe such a deference to other Judges and former times, as not to suppose that they acted wholly without consideration.” This consideration ought to weigh in this case, were the words of the act even less imperious than they are. In a case so plain it is difficult to quote authorities. I believe however, that I have one which fully applies to the case before us.
In the case of Rowton v. Rowton,(a) the fact was, that the son, whose widow claimed dower, had removed to a tract of land at the express instance of his father, possessed it several years during the cover-ture, and laid out money and labouring improvements, and died in possession of it. It -was not denied, and cannot be, that this consideration is entirely equivalent to that of money paid. Notwithstanding the circumstances aforesaid, the father actually recovered the premises from the widow of the son after his death, in the District Court of Prince Edward, on the ground that the legal estate was in him. This de-cisión was acquiesced in, and not appealed from as at law; but a bill in equity was brought to establish the right of the widow in equity, and let her in for dower. The transaction having happened subsequent to the act of 1785, the widow claimed her dower only under the provision of that statute. Three of the Judges overruled her claim; but it was on the ground of no contract having been approved on the father, as they thought, for more than a life estate in favour of the son: two other Judges thought that the son had an equitable estate in fee, on the testimony, and, on that ground, were in favour of the dower under the act of 1785. It never entered, however, into the head of any man at the bar, or on the bench at that time, that the son had a legal estate in the premises. The counsel in opposition to the claim of *the wife, stated that it was not even asserted by his adversary that the son had the legal estate in the premises; nor was it asserted by any of the adverse counsel, although some of them are at least as learned in the black letter as is necessary. The same counsel also admitted that, under the act of 1785, the widow was entitled to dower, provided it should appear that her husband had such an equity in a. fee-simple estate as would authorise a Court of Equity to decree the legal estate; which, however, he denied to be proved in the cause: it never entered into his head that it would be contended that the son had in fact the legal estate, by reason of the promise, the possession, and the consideration paid for the same. In deciding the case the Judge who has just spoken, disclaimed, in effect, the position he now advocates, by not contending for it then ; by contending, on the contrary, that these circumstances entitled the son to “a performance of the father’s promise,” in a manner the most beneficial for himself and family.

 Co. Litt. 9, a. 121, b. Litt. s. 59, 60, 183; Gilb. L. Uses, 87.

 Co. Litt. ubi supra, Sheppard’s Touchstone,. 480, 484, (5th ed.)

a) Ibid. 218.

 Litt. s. 59, 60, Sbep. T. 128.

 Sbep. T. 480, 482, 484.

 Shep. T. 477, 493.

 Sbep. T. 477, 478.

 Sbep. T. 484 ; 8 Co. 94; 2 In st. 675; Dyer, 229; 12 Mod. 162,163; Gilb. D. Uses, 271; 2 Konb. 33, 21, no.

j Har. Co. Litt. p. 48, note 1, and 3; Shep. T. 204, 493.

b) Dyer, 337, a.

 l Co. 132.

 Bac. Law Tracts, 338.

 Lit. s. 167; Co. Lit. 111.

 Shep. Touch. 218; Butler’s note in Co. Lit. 375, a.

 Hob. 165.

 Shep. Touch. 218; Harg. Co. Hit. 2.

 See 12 Mod. 162, before referred to, p. 337.

 2P. Wms. 646.

 Perkins, 457, 458.

 2 Bro. Ch. 271.

 Harg. Co. Litt. p. 32, b. n. 3.

 See Gwyl. Bac. vol. 2, 132, (6th vol. 413, of old edit.) Ibid. 100, Sir W. Jones’s Rep. 317, Mathew Taylor’s case cited.

3 Call, 370.

 t Wash. 217.

 See also Co. Litt. 32.

 2 Fonb. 147, n.; Williams v. Lamb. 3, Bro. Oh.. 264, there cited. See also 1 Fonb. 22, n. 157, n.

 Milford’s Pleadings In Chancery, 109,110, 111.

 Shep. 484. 2 Inst. 675.

 2 Salk. 679 ; 2 Lord Raym. 876—878; 1 Eq. Ca. Abr. 888.

1 Vent. 232, cited 2 Salk. 679, in margr.

 John Randolph’s MS. Rep. 77.

 April General Court, 1755, MSS. of John Randolph, Esq. p. 77.

 1 Nonb. 9.

 Vide Laws Virg. 1705. c. 19, 1753, c. 1, 1794, c. 64.

 See Prec. in Oka. 134, Hitchin v. Hitchin.

 Show. Par. Cas. 71.

 Free. In Cha. anno 1712.

 2 P. wms. 701.

 1 Bac. Gwyll. edit. 185.

 8 P. Wms. 229.

 Cases temp. Talk. 138.

 Vernon’s case, 4 Co. 1.

 2 Atk. 525.

 1 Atk. 603.

 1 Bro. Ch. Rep. 326.

 MS. Rep. by J. Randolph.

 1 Wash. 303.

 ibid. 322.

 1 P. Tms, 410.

 2 P. Wms. 3.

t) 3 Atk. 5.

fe) Ibid. 140.

 1 Black. Com. 70.

 1 Vesey, 357.

 Ibid. 137.

 1 Bro. Ch. Rep. 328, Dixom v. Saville.

1 Black. Com. 86.

 1 Hen. & Munf. 92.

) See note to 3 P. wms. 719, Cox’s ed. Also note to page 139, of Cases temp. Talb. 3d ed. — Note in Original Edition.

 2 Bac. Ab. 127, 128.